UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
VINCENT CASTAGNOZZI,

                        Plaintiff,

        –against–                              **MEMORANDUM AND ORDER**

PHOENIX BEVERAGES, INC., WINDMILL                13-CV-2618 (SLT)(JO)
DISTRIBUTING COMPANY, L.P., RODNEY
BRAYMAN, PHIL CURCIO, KEN PATERNO,
ANGELO SRGO, and PETER DYDENSBORG,

                        Defendants.
---------------------------------------------------------------x
**TOWNES, United States District Judge:**

       Plaintiff Vincent Castagnozzi ("Plaintiff") brings this employment discrimination action

against his former employer, Windmill Distributing Company L.P. d/b/a Phoenix Beverages,

Inc. ("Phoenix"); Phoenix's Chief Executive Officer, Rodney Brayman; and four Phoenix

employees (collectively, "Defendants"), alleging that Defendants violated his rights under the

Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), the New York State

Human Rights Law, N.Y. Exec. Law § 296 *et seq.* ("NYSHRL"), and the New York City

Human Rights Law, N.Y.C. Admin. Code § 8-107 ("NYCHRL"), by failing to provide a

reasonable accommodation for his disability and terminating him in retaliation for complaining

about disability discrimination. Defendants now move for summary judgment, principally

arguing that Plaintiff does not suffer from a "disability" as defined by the ADA, has failed to

identify a reasonable accommodation that would enable him to perform his job, and was

terminated only because he refused to work on a weekend, not because of his complaints. For

the reasons set forth below, Defendants' motion for summary judgment is granted with respect

to all of the federal claims. The Court declines to exercise supplemental jurisdiction with respect to Plaintiff's State- and City-law claims.

## BACKGROUND

Unless otherwise stated, the following facts are not in dispute or are drawn from Plaintiff's version of events. In February 1998, Plaintiff began working as an off-premises sales representative at Phoenix, one of New York City's largest beer distributors. (Defendants' Rule 56.1 Statement of Undisputed Facts ("Defendants' 56.1 Statement") ¶ 3; Plaintiff's Response to Defendants' Rule 56.1 Statement of Undisputed Facts ("Plaintiff's 56.1 Response"), p 1 & p. 5, ¶ A; Defendants' Response to Plaintiff's Response to Defendants' Rule 56.1 Statement of Undisputed Facts ("Defendants' 56.1 Response"), p. 3, ¶ A). To perform the essential duties of that job, Plaintiff had to be able to lift, carry, and climb up and down stairs carrying cases weighing more than 25 pounds on a frequent basis. (Defendants' 56.1 Statement ¶ 4; Plaintiff's 56.1 Response, p. 1).

While driving his sales route on Wednesday, May 12, 2010, Plaintiff was involved in an automobile accident. (Defendants' 56.1 Statement ¶ 5; Plaintiff's 56.1 Response, p. 1 & p. 5, ¶ B; Defendants' 56.1 Response, p. 3, ¶ B). Plaintiff suffered an injury to his neck, causing him to take seven days of disability leave. (Defendants' 56.1 Statement ¶¶ 5-6; Plaintiff's 56.1 Response, p. 1 & p. 5, ¶ B; Defendants' 56.1 Response, p. 3, ¶ B). Plaintiff returned to work on Monday, May 24, 2010, and worked for approximately three more weeks. (Defendants' 56.1 Statement ¶ 7; Plaintiff's 56.1 Response, p. 1 & p. 5, ¶ C; Defendants' 56.1 Response, p. 3, ¶ C). However, in mid-June 2010, Plaintiff ceased working once again, alleging that his injury

prevented him from continuing. (Defendants' 56.1 Statement ¶ 8; Plaintiff's 56.1 Response, p. 1 & p. , ¶ C; Defendants' 56.1 Response ¶ C).

Although the parties have not introduced any medical records, an email sent by Dr. Heidi Sanger to Plaintiff on June 15, 2010, describes the nature of Plaintiff's neck condition. According to that email—which was introduced as Exhibit 3 during Plaintiff's February 28, 2014, deposition and which is attached to Exhibit A to the Declaration of Eugene T. D'Ablemont in Support of Defendants' Motion for Summary Judgment (the "D'Ablemont Declaration")—an X-ray of Plaintiff's neck revealed two abnormalities. First, the X-ray revealed osteophytes at all levels between C3 and C6.[1] The email opined that these osteophytes were caused by arthritis, not the automobile accident. Second, the X-ray showed a narrowing of the intervertebral discs at the C3-C4 and C5-C6 levels, which the email attributed to the accident. Dr. Sanger predicted that it would take 6 to 8 weeks for the nerve damage associated with the disc narrowing to heal, but implied that Plaintiff would have to live with the arthritis.

Although Plaintiff's injury did not require in-patient care or surgery, and was treated only with anti-inflammatory medicine and physical therapy, Plaintiff remained out of work for about ten months. (Defendants' 56.1 Statement ¶ 9; Plaintiff's 56.1 Response, p. 1). On October 27, 2010, Phoenix sent a letter informing Plaintiff that the 12-week period during which his job was protected by the Family and Medical Leave Act had ended on September 10, 2010.

---

[1]Osteophytes, commonly referred to as "bone spurs," can form on the vertebrae—the bones of the spine. *See* http://www.mayoclinic.org/diseases-conditions/bone-spurs/basics/definition/con-20024478. In this case, the X-rays showed bone spurs from C3 to C6: the third, fourth, fifth and sixth vertebrae from the skull. The main cause of bone spurs is the joint damage associated with osteoarthritis. *Id.*

(Defendants' 56.1 Statement ¶ 10; Plaintiff's 56.1 Response, p. 1). The letter informed Plaintiff that Phoenix was no longer legally obligated to hold his position open. (*Id.*).

On Thursday, March 24, 2011, Dr. Sireen M Gopal, a physiatrist at New York Spine & Sport Rehabilitation Medicine, cleared Plaintiff to "return to work on full duty" on April 1, 2011. (Defendants' 56.1 Statement ¶ 12; Plaintiff's 56.1 Response, p. 1; Castagnozzi Deposition, Ex. 8).[2] However, when Plaintiff reported for work on Monday, April 4, 2011, he was told that no sales representative positions were available. (Defendants' 56.1 Statement ¶ 13; Plaintiff's 56.1 Response, p. 1 & p. 6, ¶ F; Defendants' 56.1 Response, p. 3, ¶ F). Instead, he was offered a position as a "general sales specialist," a substitute for sales representatives who were sick or on vacation. (Defendants' 56.1 Statement ¶¶ 14-15; Plaintiff's 56.1 Response, p. 1 & p. 6, ¶ F; Defendants' 56.1 Response, p. 3, ¶ F). The general sales specialist position had the same duties and responsibilities as Plaintiff's former position as sales representative, but paid less because the general sales representative had no dedicated sales territory. (Defendants' 56.1 Statement ¶¶ 15-16; Plaintiff's 56.1 Response, p. 1 & p. 6, ¶ G; Defendants' 56.1 Response, p. 3, ¶ G).

Plaintiff accepted the offer and worked as a general sales specialist for seven months. (Plaintiff's 56.1 Response, p. 6, ¶ H; Defendants' 56.1 Response, pp. 3-4, ¶ H). On November 4, 2011, however, the general sales specialist position was eliminated as part of a restructuring of Phoenix's Sales Department. (Defendants' 56.1 Statement ¶¶ 17-18; Plaintiff's 56.1 Response, p. 1 & p. 6, ¶ H; Defendants' 56.1 Response, pp. 3-4, ¶ H). The restructuring also reduced the

---

[2]Some of the exhibits introduced during Plaintiff's February 28, 2014, deposition are attached to Exhibit A to the D'Ablemont Declaration and to Exhibit A to the Reply Declaration of Eugene T. D'Ablemont in Further Support of Defendants' Motion for Summary Judgment (the "D'Ablemont Reply Declaration").

number of sales representatives from 46 to 33, but increased the number of "merchandisers" from 14 to 20. (Defendants' 56.1 Statement ¶ 19; Plaintiff's 56.1 Response, p. 1). While there were no merchandiser positions available in the sales group where Plaintiff had worked as a general sales representative, such a position was available in another sales group, headed by defendant Phil Curcio. (Defendants' 56.1 Statement ¶ 20; Plaintiff's 56.1 Response, p. 1).

On November 4, 2011, Plaintiff met with Curcio, a Sales Manager, who offered Plaintiff a position as a merchandiser starting on Monday, November 7, 2011. (Defendants' 56.1 Statement ¶ 21; Plaintiff's 56.1 Response, p. 1). The merchandiser position required more physical labor than the sales representative or general sales specialist positions. (Plaintiff's 56.1 Response, p. 6, ¶ J; Defendants' 56.1 Response, p. 4, ¶ J). Although Plaintiff already knew the physical duties of the job. (Defendants' 56.1 Statement ¶ 24; Plaintiff's 56.1 Response, p. 1), Curcio "explained to him that it was a much more physically demanding position" and that "was potentially maybe a drawback." (Curcio: 40).[3] At his deposition, Curcio testified that he brought up this topic because he knew of Plaintiff's prior injury, was concerned that the injury might interfere with Plaintiff's physical ability to perform the job, and wanted to communicate that it would not be in Plaintiff's best interest to take the position if he, too, had concerns about his ability to perform. (Curcio: 41-42). According to Curcio, Plaintiff assured him that he was "physically up to ... the position" and could do the merchandiser job. (Curcio: 42).

---

[3]Numbers preceded by "Curcio" denote pages in the transcript of Curcio's March 18, 2014, deposition. Excerpts from that transcript are attached to the D'Ablemont Declaration as Exhibit B, to the Declaration of Benjamin N. Leftin in Opposition to Defendants' Motion for Summary Judgment (the "Leftin Declaration") as Exhibit 2, and to the D'Ablemont Reply Declaration as Exhibit B.

Plaintiff did express concerns, however, about working weekends. (Plaintiff's 56.1 Response, p. 6, ¶ N; Defendants' 56.1 Response, p. 6, ¶ N). By all accounts, Plaintiff told Curcio that he could not work weekends. (Curcio: 42; Castagnozzi: 163).[4] There is some dispute as to whether Plaintiff explained to Curcio that his unavailability was due to his wife's work and his childcare obligations. (Plaintiff's 56.1 Response, p. 6, ¶ N; Defendants' 56.1 Response, p. 6, ¶ N), but no one contends that Plaintiff's inability to work weekends had anything to do with his alleged disability.

The parties essentially agree that Curcio himself had no problem with Plaintiff not working weekends, but indicated that scheduling was determined by the district manager, defendant Ken Paterno, who would be Plaintiff's immediate supervisor. (Plaintiff's 56.1 Response, p. 7, ¶¶ O-P; Defendants' 56.1 Response, pp. 6-7, ¶¶ O-P). Curcio recalled:

> [W]hen he expressed his concern about working weekends, I said that was — your regular schedule is based purely on the needs of the group, so your district manager, if your district manager doesn't need you to work on the weekends, then there's no need for you to work the weekends. I said that's purely in the realm of the district manager's decision (Curcio: 43).

Plaintiff testified that Curcio said he "didn't have a problem with me not working weekends," but "told me to speak to Ken Paterno." (Castagnozzi: 130).

There is a dispute as to what Paterno said to Plaintiff during their subsequent conversation. Plaintiff testified that Paterno "didn't have a problem" with his not working

---

[4]Numbers preceded by "Castagnozzi" denote pages in the transcript of Plaintiff's February 28, 2014, deposition. Excerpts from that transcript are attached to the D'Ablemont Declaration as Exhibit A, to the Leftin Declaration as Exhibit 1, and to the D'Ablemont Reply Declaration as Exhibit A.

weekends "because Phil [Curcio] didn't have a problem with it." (Castagnozzi: 174). Paterno, in contrast, testified:

> I told him Phil [Curcio] had explained to me what their conversation was as far as the weekends, and I told him I would do the best I could, not to work him, but I do also say you understand that during the busiest times of the year, you may be asked to work, if I have no one else. (Paterno: 22).[5]

Paterno further testified that he mentioned Thanksgiving during his conversation with Plaintiff, though he did not specifically tell Plaintiff that he would have to work a weekend around Thanksgiving. (Paterno: 23).

Plaintiff accepted the merchandiser position and started work on Monday, November 7, 2011. (Defendants' 56.1 Statement ¶ 26; Plaintiff's 56.1 Response, p. 1). At his deposition, Plaintiff testified that he spent that day as a chauffeur, driving one of the salespeople around in his car. (Castagnozzi: 134-35). Plaintiff was off work the next two days. (Castagnozzi: 140). However, sometime on Wednesday, November 9, 2011, Plaintiff learned for the first time that his pay as a merchandiser would be lower than it had been when he worked as a general sales specialist. (Defendants' 56.1 Statement ¶ 28; Plaintiff's 56.1 Response, p. 1).

That evening, Plaintiff sent an email to defendant Angelo Srgo, Phoenix's Director of Human Resources, requesting an appointment to discuss his salary. (*Id.*). That email did not mention that Plaintiff had a disability which prevented him from performing the essential tasks of a merchandiser or that he needed an accommodation. (Defendants' 56.1 Statement ¶ 29; Plaintiff's 56.1 Response, p. 1). In an email sent on the morning of November 10, 2011—

---

[5]Numbers preceded by "Paterno" denote pages in the transcript of Paterno's March 19, 2014, deposition. Excerpts from that transcript are attached to the Leftin Declaration as Exhibit 3 and to the D'Ablemont Reply Declaration as Exhibit C.

introduced as Exhibit 15 during Plaintiff's February 28, 2014, deposition and attached to Exhibit A of the D'Ablemont Declaration—Srgo responded to Plaintiff's email by inviting him to "stop by tomorrow."

According to Plaintiff, he worked a "full day performing the duties of a merchandiser on Thursday, November 10, 2011, but his injuries caused him to suffer great pain." (Plaintiff's 56.1 Response, p. 7, ¶ S). Later that day, with the assistance of his wife, Plaintiff drafted a letter stating that he was unable to "perform the duties of merchandiser without experiencing great pain and risking further injury" to his neck and spine. (Plaintiff's 56.1 Response, p. 7, ¶ T; Defendants' 56.1 Response, p. 8, ¶ T). In that letter (hereafter, the "November 10 Letter"), a copy of which is attached to the Leftin Declaration as Exhibit 4, Plaintiff stated that he was "concerned" that he was "being discriminated against on the basis of [his] physical disability" and was "not being afforded a reasonable accommodation for that disability." He opined that a "reasonable accommodation would be to assign [him] a position where [he] would not have to constantly lift, pull, carry and pack-out heavy cases of beer—such as the position of salesperson ...." He further noted that a sales route in Astoria had become available in October, but that the company had "essentially eliminated the route" by dividing it among other salespeople in Queens. He concluded, "I would hope that the company would consider, in light of my almost fourteen years of dedicated service, and as a reasonable accommodation for my disability, assigning me to a route, such as the Astoria route ...."

When questioned about that letter at his deposition, Plaintiff described his physical disability as "[t]he disability for me handling all the product." (Castagnozzi: 149). He admitted that he did not have a medical evaluation supporting his claim of disability at that time.

(Castagnozzi: 149). Accordingly, he could not, and did not, offer Srgo any medical documentation to substantiate his claim of disability. (Castagnozzi: 149-50).

Plaintiff hand-delivered the November 10 Letter to Srgo at their meeting on Friday, November 11, 2011. (Defendants' 56.1 Statement ¶ 32; Plaintiff's 56.1 Response, p. 3, ¶ 32). However, according to Plaintiff's own testimony, he never orally told Srgo that he was disabled, could not perform the duties of a merchandiser, and needed a reasonable accommodation. (Castagnozzi: 153-54). Rather, Plaintiff only asked Srgo for "more salary," a request which Srgo refused. (Castagnozzi: 153-54).

In describing the events which transpired during the two weeks after Plaintiff's meeting with Srgo, the parties cite to the same evidence but characterize it differently. The following description of those events is drawn largely from the evidence cited by the parties. The Court also relies on portions of Plaintiff's deposition testimony, which the Court credits for purposes of this Memorandum and Order.

First, it is undisputed that Plaintiff continued to work as a merchandiser after his meeting with Srgo. He worked on Friday, November 11, 2011, and every day the following week except for Tuesday (Castagnozzi: 153, 157-58). He also worked Monday and Tuesday of the following week, and was in the office for at least part of Wednesday, November 23, 2011—the day Plaintiff was terminated. (Castagnozzi: 167-68).

At some point during the workweek beginning on Monday, November 14, 1011, Srgo told Curcio about the November 10 Letter. According to Curcio, Srgo never gave him a copy of the letter, but reviewed its contents with Curcio. (Curcio: 51-53). In the course of their conversation, Curcio learned that Plaintiff was "complaining about his disability and inability to

do the merchandiser position." (Curcio: 51). Srgo did not advise Curcio about his options or tell Curcio what to do with respect to scheduling Plaintiff's work or limiting Plaintiff's responsibilities. (Curcio: 55). According to Curcio, Srgo said only that he wanted to be informed if Plaintiff "was to express that he could not do the job, physically," and instructed Curcio to have Plaintiff talk to Srgo in that eventuality. (*Id.*).

Because Plaintiff continued to work as a merchandiser, Curcio assumed that Plaintiff was not was actually disabled. (Curcio: 80). Nonetheless, Curcio inquired about Plaintiff's ability to work. At some juncture, Curcio asked Srgo if Plaintiff still had clearance to work. (Curcio: 60). He also spoke to Plaintiff personally, although Curcio's deposition testimony contains conflicting accounts of the precise question he posed to Plaintiff and Plaintiff's response. First, Curcio testified that he specifically asked, "Are you able to work ... because you're being scheduled," and that Plaintiff replied, "I can do the schedule." (Curcio: 61-62). Later, Curcio testified that he only "asked him if he felt okay," and that Plaintiff said "he felt fine." (Curcio: 65).

There is no proof that either Curcio or Srgo ever told Plaintiff's immediate supervisor, Paterno, about the complaints contained in Plaintiff's letter dated November 10, 2011. Indeed, Curcio testified that he did not do so, (Curcio: 59), and both Curcio and Paterno testified that Srgo did not convey Plaintiff's complaints to Paterno. (Curcio: 60; Paterno: 44).

At a sales meeting sometime during Friday, November 18, 2011, Paterno told Plaintiff that he might be needed to work the Saturday after Thanksgiving. (Defendants' 56.1 Statement ¶ 49; Plaintiff's 56.1 Response, p. 1). Although Plaintiff was aware that it was a "[k]ey weekend for sales" (Castagnozzi: 168), Plaintiff responded by telling Paterno he could not work weekends. (Defendants' 56.1 Statement ¶ 50; Plaintiff's 56.1 Response, p. 1). Thereafter, Paterno sent

Plaintiff an email—included in Exhibit 6 to the Leftin Declaration—reminding Plaintiff that it was "the busiest time of the year," and stating, "you may be asked to work on a Sunday since you are not able to work Saturdays." Plaintiff replied by sending an email to Paterno, with a copy to Curcio, clarifying that he was not available to work either Saturdays or Sundays. (Defendants' 56.1 Statement ¶ 51; Plaintiff's 56.1 Response, p. 1; Leftin Declaration, Ex. 6). In that email, which is also included in Exhibit 6 to the Leftin Declaration, Plaintiff asserted: "my wife meets with clients on the weekends and I have to be available to care for our son." (Leftin Declaration, Ex. 6). He noted that he had mentioned his inability to work weekends on November 4, 2011, stating:

> When I was demoted to this position, on November 4, 2011 due to
> the company's reorganization, without regard to my disability, my
> salary requirements or my seniority, after fourteen years of
> dedicated service, I spoke with Phil [Curcio] about my concerns
> that the position requires weekends and I could not work
> weekends. (Leftin Declaration, Ex. 6).

After representing that Curcio said "it was fine with him if it was okay with you" and that Paterno had previously said that he "did not see a problem" with Plaintiff not working weekends, Plaintiff concluded: "I am sorry but as I have always maintained, I am not available to work weekends. You and Phil knew this when I first was demoted and that was acceptable then." (*Id.*).

After receiving Plaintiff's email, Paterno spoke with Curcio. Paterno told Curcio that this email was the first he had heard about Plaintiff having a disability, but Curcio said nothing on that subject. (Paterno: 44-45). Rather, Curcio addressed only the issue of whether Plaintiff had been advised when he was hired that he might need to work weekends, saying that Plaintiff was on notice that he would be required to work the busier times if necessary. (Paterno: 44-45).

11

On the afternoon of November 18, 2011, Curcio forwarded Plaintiff's email to Srgo, along with an email of his own entitled, "Castagnozzi – Potential Refusal to Work Sunday." (Leftin Declaration, Ex. 7). Curcio provided Srgo with his recollection of his November 4, 2011, conversation with Plaintiff regarding weekend work, stating:

> My initial conversation with him when he expressed concerns about working weekends was that he would not need to work weekends if Ken [Paterno] DID NOT need him to do so. I also let him know that he would need to work certain holiday weekends based on business. He understood that; whether or not he was simply placating me I do not know. (Leftin Declaration, Ex. 7) (emphasis in original).

Curcio concluded the email by stating, "I do not want this to drag out. Please recommend next steps." (*Id.*).

At some point on November 18, 2011, or Monday, November 21, 2011, Curcio told Paterno that all of the merchandisers had to work during the weekend after Thanksgiving. (Paterno: 54). According to both Curcio and Paterno, scheduling in their group was normally left to district managers, who made schedules for their merchandisers without consulting the sales manager. (Curcio: 33, 35, 47-48, ; Paterno: 47-48). Schedules for the weekend were created on the Friday morning before that weekend, after the district manager learned how many merchandisers were needed. (Paterno: 47-48).

The scheduling for the weekend before Thanksgiving had been left to Paterno to decide. (Paterno: 50). However, according to Paterno, Curcio dictated the scheduling for the weekend after Thanksgiving "[b]ecause of the volume, knowing the volume that we do, prior to the holiday how many people, how many stores would need service that following weekend. They

take extra product into the stores, more so after a holiday because they want to get the shelves refilled." (Paterno: 51).

On Monday, November 21, 2011, Paterno told Plaintiff that he would probably have to work the next Saturday or Sunday. (Paterno: 54-55). When Plaintiff again said he could not work, Paterno reported his refusal to Curcio. (Paterno: 55). Paterno also told Curcio that there was a chance he would not need Plaintiff, and would have to wait to see how much work needed to be done. (Paterno: 56). Nonetheless, Curcio repeated that all merchandisers were to be scheduled to work. (Paterno: 55-56).

At a sales meeting on Wednesday, November 23, 2011, Paterno told Plaintiff that he was going to need him to work that weekend. (Paterno: 54; Castagnozzi: 167-68). When Plaintiff stated that he could not work that weekend, Paterno sent Plaintiff to Human Resources, where he met with Srgo and Curcio. (Castagnozzi: 169-70). They, too, told Plaintiff that he had to work on the weekend after Thanksgiving, but Plaintiff again refused to work. (Castagnozzi: 170).

Srgo and Curcio replied by stating that they could not have an employee dictate his schedule. (Castagnozzi: 171). Plaintiff denied that he was dictating his schedule, but still refused to work that weekend. (*Id.*). At the time, Plaintiff did not know whether his wife actually had to work that weekend. (Defendants' 56.1 Statement ¶ 54; Plaintiff's 56.1 Response, p. 1; Castagnozzi: 172, 175). He was certain, however, that he had previously reached an understanding with Curcio and Paterno that he would not have to work weekends. (Castagnozzi: 171). At his deposition, Plaintiff flatly denied that Curcio's recollection of their November 4, 2011, conversation—to wit, that Plaintiff understood that there would be holiday weekends where he had to work—was correct. (Castagnozzi: 174-75)

At the close of their November 23, 2011, meeting, Srgo told Plaintiff that Phoenix would have to let him go because Plaintiff was dictating his schedule by refusing to work that weekend. (Defendants' 56.1 Statement ¶ 55; Plaintiff's 56.1 Response, p. 1; Castagnozzi: 175-76). In late February 2012, Plaintiff dually filed a charge of disability discrimination and retaliation with the Equal Employment Opportunity Commission (the "EEOC") and the New York State Division of Human Rights (the "SDHR"). (Defendants' 56.1 Statement ¶ 56; Plaintiff's 56.1 Response, p. 1). That charge did not describe the nature of Plaintiff's disability, alleging only that Plaintiff had "suffered severe injuries that required [his] absence from work" for a period of less than a year. (D'Ablemont Declaration, Ex. D). The charge further alleged that Plaintiff had been discriminated against by, among other things, being demoted twice and being terminated on a pretextual basis after asking for a reasonable accommodation. (*Id.*).

On February 15, 2013, the EEOC mailed Plaintiff a right-to-sue notice. In that notice, the EEOC stated that it was unable to conclude that the information obtained in the course of its investigation established the violation of any anti-discrimination statutes. (D'Ablemont Declaration, Ex. E). The notice advised Plaintiff that he had 90 days in which to commence a lawsuit against Phoenix.

### *The Instant Action*

On April 30, 2013, Plaintiff commenced this action against Phoenix; its Chief Executive Officer, Brayman; its Director of Human Resources, Srgo; and three individuals in its sales department: Curcio, Paterno, and Peter Dydensborg, the Director of Sales. The pleading alleges six causes of action, the first two of which allege violations of the ADA, the next two of which allege violations of the NYSHRL, and the last two of which allege violations of the NYCHRL.

14

The first, third and fifth causes of action each allege disability discrimination, asserting that Plaintiff suffers from a disability as defined by the ADA, the NYSHRL, or the NYCHRL, respectively, and that Defendants failed to provide Plaintiff with a reasonable accommodation for this disability or to engage in any meaningful attempts to accommodate the disability. The second, fourth, and sixth causes of action each allege retaliatory termination, asserting that Plaintiff was terminated for complaining to Defendants about the unlawful discrimination in violation of the ADA, the NYSHRL, or the NYCHRL, respectively.

***The Instant Motion for Summary Judgment***

Defendants now move for summary judgment. The Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defendants' Memo") raises three grounds, one relating to each of the first two causes of action and the third relating to the four remaining claims. First, Defendants seek summary judgment on Plaintiff's first cause of action, arguing that Plaintiff cannot establish a prima facie case of disability discrimination. Defendants principally argue that Plaintiff never suffered from a "disability," as defined by the ADA, but merely claimed that he was disabled in an effort to obtain a higher salary. Defendants also argue that, even if Plaintiff was disabled, he failed to propose a reasonable accommodation.

Second, Defendants seek summary judgment with respect to the second cause of action, arguing that the only reason Plaintiff was terminated was because he was dictating his work schedule by refusing to work weekends. Defendants note that Plaintiff alleged that he was unable to work weekends because of his childcare obligations and not because of his alleged disability.

Third, Defendants assert that summary judgment is warranted on Plaintiff's State- and City-law claims for two reasons. First, noting that claims under the NYSHRL are analyzed under the same standard as claims under the ADA, Defendants imply that the State-law claims should be dismissed if the ADA claims are dismissed. Second, Defendants argue that the State- and City-law claims are barred by the election of remedies provisions in both the NYSHRL and the NYCHRL, which preclude a claimant from filing a lawsuit if he or she has filed a complaint with the State Division of Human Rights or the City Commission on Human Rights.

Plaintiff addresses only the first two of Defendants' three grounds in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Opposition"). First, he asserts that he is disabled because he "suffered a debilitating neck injury that prevented him from engaging in many major life activities, including lifting, standing, sitting, and, most notably and indisputably, working." (Plaintiff's Opposition, p. 6). In support of this assertion, Plaintiff notes that his injury "required his absence from work for ten months" and alleges that Plaintiff "provided Defendants with all necessary medical documentation to justify his leave." (*Id.*, p. 7). However, Plaintiff's opposition papers do not include that medical documentation.

With respect to the first point, Plaintiff also argues that, even if he was not actually disabled, Defendants perceived him as disabled. In support of this argument, Plaintiff asserts that Curcio admitted 1) that he had concerns about Plaintiff's ability to perform the physical aspects of the merchandiser position; 2) that, during their discussion of Plaintiff's November 10 Letter, Curcio and Srgo's "only concern was that Plaintiff's claimed disability would negatively impact Curcio's group's performance," and 3) that when Plaintiff "complained again about his

16

disability," Curcio, anticipating another disability leave, "looked for an excuse to terminate Plaintiff, saying that he 'did not want to drag this out.'" (*Id.*, p. 7).

With respect to Defendants' second ground for summary judgment, Plaintiff argues that he has made out a prima facie case of retaliation under the ADA. Plaintiff further argues that summary judgment should not be granted because there are factual disputes as to (1) whether the terms of Plaintiff's employment prohibited weekend work and (2) whether Defendants's stated reasons for terminating Plaintiff are mere pretexts for discrimination and retaliation.

## *DISCUSSION*

### *I. Summary Judgment Standard*

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotations omitted; brackets added).

Initially, the moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must then "set forth specific facts showing that there is a genuine issue for trial." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal quotation omitted); *see Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a

motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation omitted; brackets in original). Moreover, a party cannot sustain its burden in opposing summary judgment by relying on inadmissible hearsay evidence. *See G.I. Home Developing Corp. v. Weis*, 499 F. App'x 87, 90 (2d Cir. 2012) (summary order).

When evaluating a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all ambiguities in his favor. *See Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *see also Swartz v. Insogna*, 704 F.3d 105, 109 (2d Cir. 2013). No genuine triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996). "If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (quoting Anderson, 477 U.S. at 249-50) (brackets added in *Scotto*).

## II. The McDonnell Douglas Analysis

In analyzing an ADA case, one applies the same burden-shifting analysis originally established by the Supreme Court in a Title VII case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999); *see also Greenway v. Buffalo*

*Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) (applying *McDonnell Douglas* analysis to an ADA

claim). Under the *McDonnell Douglas* burden-shifting framework:

> [P]laintiff bears the initial burden of proving by a preponderance of
> the evidence a prima facie case of discrimination. ... The burden
> of production then shifts to defendants, who must offer through the
> introduction of admissible evidence a non-discriminatory reason
> for their actions that, if believed by the trier of fact, would support
> a finding that unlawful discrimination was not a cause of the
> disputed employment action. Plaintiff then must show that the
> proferred reason was merely a pretext for discrimination, which
> may be demonstrated either by the presentation of additional
> evidence showing that the employer's proffered explanation is
> unworthy of credence, or by reliance on the evidence comprising
> the prima facie case, without more.

*Heyman*, 198 F.3d at 72 (internal quotations and citations omitted) (citing *Chambers v. TRM

Copy Centers Corp.*, 43 F.3d 29, 37-38 (2d Cir. 1994)).

### III. The Disability Discrimination Claim

Defendants seek summary judgment with respect to the first cause of action on the

ground that Plaintiff cannot make out a prima facie case of disability discrimination.

Defendants argue that in order to establish a prima facie case of disability discrimination under

the ADA, Plaintiff must show that "(1) he suffers from a 'disability'; (2) he could perform the

essential functions of his job, with or without reasonable accommodation; and (3) he was fired

because of his disability." Defendants' Memo, p. 18 (citing *Ryan v. Grae & Rybicki, P.C.*, 135

F.3d 867, 869-70 (2d Cir. 1998)). Defendants argue that Plaintiff cannot make out the first two

of these elements.

Preliminarily, the Court notes that Defendants are not using the correct standard.

Plaintiff's first cause of action does not allege that Defendants fired him because of his

disability, but only that Defendants failed to provide a reasonable accommodation or to engage

in meaningful attempts to accommodate his disability. Thus, Plaintiff appears to be alleging a

violation of 42 U.S.C. § 12112(b)(5)(A), which provides that it is disability discrimination not

to make "reasonable accommodations to the known physical or mental limitations of an

otherwise qualified individual with a disability." In order to makes out a prima facie case of

disability discrimination arising from a failure to accommodate, a plaintiff must show "(1)

plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by

the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could

perform the essential functions of the job at issue; and (4) the employer has refused to make

such accommodations." *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006)

(quoting *Rodal v. Anesthesia Group of Onondaga, P. C.*, 369 F.3d 113, 118 (2d Cir. 2004)).

Although Defendants may have quoted the wrong standard, their arguments for summary

judgment on the first cause of action relate to elements contained in both standards. Both

standards require that Plaintiff establish that he has a "disability." They also require that

Plaintiff demonstrate that he can perform the essential duties of the position with a reaonable

accommodation.

### A. *Disability*

Under the ADA, as amended by the ADA Amendments Act of 2008 (the "ADAAA"), the

term "disability" means "(A) a physical or mental impairment that substantially limits one or

more major life activities of such individual; (B) a record of such an impairment; or (C) being

regarded as having such an impairment ...." 42 U.S.C. § 12102(1). In this case, Plaintiff argues

that his meets the definitions set forth in subsections (A) and (C). He does not argue that Plaintiff has a record of impairment under subsection (B).

### 1. Subsection (A)

In determining whether an individual has a disability for purposes of subsection (A), the Second Circuit has applied the three-step approach taken by the Supreme Court in *Bragdon v. Abbott*, 524 U.S. 624 (1998). *See Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002) (citing *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 641 (2d Cir. 1998)). Under that approach, a plaintiff must 1) show that he suffers from a physical or mental impairment, 2) identify the activity claimed to be impaired and establish that it constitutes a "major life activity," and 3) show that the impairment "substantially limits" the major life activity previously identified. *Id.*

With respect to the first step, "the ADA does not define 'physical or mental impairment.'" *Gaube v. Day Kimball Hosp.*, No. 3:13-CV-01845 (VAB), 2015 WL 1347000, at *6 (D. Conn. Mar. 24, 2015). That phrase is defined, however, in the EEOC's regulations, which define a physical impairment as "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine ...." 29 C.F.R. § 1630.2(h).

In this case, the parties agree that Plaintiff suffered an injury to his neck in a work-related automobile accident on May 12, 2010. (Defendants' 56.1 Statement ¶¶ 5-6; Plaintiff's 56.1 Response, p. 1 & p. 5, ¶ B; Defendants' 56.1 Response, p. 3, ¶ B). Although Plaintiff's

submissions do not elaborate on the precise nature of the injury or provide any evidence pertaining to the injury, the Court notes that an email introduced as Exhibit 3 during Plaintiff's February 28, 2014, deposition indicates that Plaintiff was diagnosed in mid-June 2015 as having osteophytes at all levels between C3 and C6 and disc narrowing at C3-C4 and C5-C6. Accordingly, the Court will assume, for purposes of this memorandum and order, that Plaintiff's neck injury constitutes a physical impairment.

With respect to the second step, the ADA defines the term "major life activities" to include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Plaintiff asserts that his "neck injury ... prevented him from engaging in many major life activities, including lifting, standing, sitting, and, most notably and indisputably, working." Plaintiff's Opposition, p. 6.

With respect to the third step, however, Plaintiff does not provide any evidence that Plaintiff's neck injury substantially limited his ability to lift, stand, sit or work at any time after he returned to work in early April 2011. Rather, Plaintiff relies solely on the fact that "Plaintiff's disability required his absence from work for ten months" prior to April 2011. *Id.*, pp. 6-7. Plaintiff does not mention the fact that his own physiatrist certified that he was fit to return to full duty in late March 2011.

The only evidence that Plaintiff was unable to work in November 2011 is his letter of November 10, 2011, in which he merely alleges that he could not perform the job of merchandiser. His actions, however, belie these words. It is undisputed that Plaintiff worked as general sales specialist for seven months prior to November 7, 2011, performing essentially the

same tasks that he had performed as a sales representative. After November 10, 2011, he performed the duties of a merchandiser for approximately two weeks before being terminated on November 23, 2011. Sometime during that two-week period, Curcio inquired about Plaintiff's ability to perform the job, asking Srgo if Plaintiff still had medical clearance to work, (Curcio: 60), and asking Plaintiff either if he was "able to work," (Curcio: 61-62), or "if he felt okay." (Curcio: 65). Plaintiff did not claim to be disabled in any way, but reassured Curcio by saying either that he was able to "do the schedule," (Curcio: 61-62) or that he "felt fine." (Curcio: 65). Indeed, there is no evidence that Plaintiff orally complained to anyone that he was unable to perform the merchandiser job.

### 2. Subsection ©

For the reasons stated above, the Court concludes that no rational juror could find that Plaintiff had an impairment which substantially limited his ability to work at the times relevant to this action. However, an individual need not actually have such an impairment to be disabled for purposes of the ADA. A plaintiff is also disabled within the meaning of the ADA if he is 'regarded' by his employer as having such an impairment. 42 U.S.C. § 12102(1)(C).

The question of "whether an individual is 'regarded as' having a disability 'turns on the employer's perception of the employee' and is therefore 'a question of intent, not whether the employee has a disability.'" *Colwell*, 158 F.3d at 646 (quoting *Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir. 1997)). An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment

23

whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. §
12102(3)(A).

In arguing that he was regarded as disabled, Plaintiff relies on three pieces of evidence.
First, he notes that, at his November 4, 2011, meeting with Plaintiff, Curcio expressed "concerns
that Plaintiff would not be able to physically perform the more demanding aspects of the
[merchandiser] job." Plaintiff's Opposition, p. 7. While this may establish that Curcio was
aware that Plaintiff had injured his neck in the past, it does not establish that Curcio perceived
Plaintiff as still having an impairment. Indeed, after Plaintiff assured him that he was
"physically up to ... the position," Curcio offered Plaintiff the job. (Curcio: 42).

Second, Plaintiff argues that Curcio regarded Plaintiff as disabled after Srgo informed
him of the contents of Plaintiff's November 10 Letter. Plaintiff's Opposition, p. 7. However, the
evidence is entirely to the contrary. Curcio testified that he assumed Plaintiff was *not* actually
disabled because Plaintiff continued to work as a merchandiser. (Curcio: 80). Curcio nonetheless
questioned Plaintiff about his ability to work, and received Plaintiff's assurance that he could do
the job. (Curcio: 61-62, 65). There is no evidence that Curcio, having received these assurances,
credited Plaintiff's claim that he was disabled.

Third, Plaintiff argues that the November 18, 2011, email in which Curcio told Srgo, "I
do not want this to drag out," shows that Curcio was looking for an excuse to terminate Plaintiff
because he feared "a possible third lengthy absence from work on disability leave." Plaintiff's
Opposition, p. 7. This argument ignores the context of this email, which related solely to
Plaintiff's refusal to work weekends. Although Curcio's email attached Plaintiff's November 18,
2011, email to Paterno, in which Plaintiff made passing reference to his disability, Curcio's email

made no reference whatsoever to Plaintiff's allegations of disability. Accordingly, even assuming that Curcio's comment regarding not dragging things out implied a desire to fire Plaintiff, there no evidence that Curcio wanted to fire Plaintiff because he regarded him as disabled.

### B. Reasonable Accommodation

Even assuming that Plaintiff were an individual with a disability, he has not met the burden of proving that he could perform the job with a reasonable accommodation. With respect to this element, a plaintiff "bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment ...." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (citing *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566-67 (2d Cir. 2000), and *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 137-38 (2d Cir. 1995)). A "'reasonable accommodation' may include ... reassignment to a vacant position ...." 42 U.S.C. § 12111(9). However, "the burden of establishing that a vacancy exists [is] on the plaintiff-employee." *Jackan*, 205 F.3d at 566.

In this case, the only accommodation suggested by Plaintiff was to assign him to another position, in which he "would not have to constantly lift, pull, carry and pack-out heavy cases of beer—such as the position of salesperson ...." Leftin Declaration, Ex. 4. However, Plaintiff has not only failed to establish that a vacant sales position existed, but has tacitly conceded that there were no vacant sales routes. While Plaintiff's November 10 Letter mentions a sales route which "became available" in October 2011, it also states that the route was "essentially eliminated" by dividing the route among other salespeople. *Id.* The elimination of this route was part of a broader restructuring of the Sales Department which eliminated the general sales

specialist positions and reduced the number of sales representatives from 46 to 33 (Defendants' 56.1 Statement ¶ 19; Plaintiff's 56.1 Response, p. 1). Plaintiff's letter did not ask for a vacant position, or allege that any such positions were then available. Rather, it proposed that Phoenix recreate the previously eliminated sales route in order to accommodate him. "[T]he ADA does not require an employer to create a new position in order to provide an accommodation." *Martinsky v. City of Bridgeport*, 814 F. Supp. 2d 130, 148 (D. Conn. 2011) *aff'd*, 504 F. App'x 43 (2d Cir. 2012); *see Picinich v. United Parcel Serv.*, 321 F. Supp. 2d 485, 505 (N.D.N.Y. 2004).

Plaintiff's Opposition does not contend that any vacant positions existed, but speculates that "[i]t is ... certainly possible that many different accommodations ... could have allowed Plaintiff to work around his disability." Plaintiff's Opposition, pp. 7-8. Plaintiff's Opposition then lists some possible accommodations: "working part time ... , using a back or neck brace or taking more breaks." *Id.* There is no evidence that any of these possible accommodations were previously suggested by Plaintiff or would enable Plaintiff to perform the merchandiser job. A plaintiff must provide more than mere conjecture that a reasonable accommodation might exist. "[T]he claim fails unless the plaintiff establishes that 'an effective accommodation exist[ed] that would render her otherwise qualified.'" *Jackan*, 205 F.3d at 566 (quoting *Borkowski*, 63 F.3d at 139).

Plaintiff's failure to provide any evidence that a reasonable accommodation existed is also fatal to Plaintiff's claim that Defendants "failed to engage in any meaningful attempts to accommodate Plaintiff's disability." Complaint, ¶ 47. The Second Circuit has noted, without deciding, that it is "possible ... that a failure to engage in a sufficient interactive process where

accommodation was, in fact, possible constitutes prima facie evidence of discrimination on the basis of disability." *See McBride*, 583 F.3d at 101. The Second Circuit has also held, however, that "an employee may not recover based on his employer's failure to engage in an interactive process if he cannot show that a reasonable accommodation existed at the time of his dismissal." *McElwee v. Cty. of Orange*, 700 F.3d 635, 642 (2d Cir. 2012).

Finally, the Court notes that Plaintiff's Opposition also argues that "[i]t is ... possible that Plaintiff could have performed the essential functions of the merchandiser position ... *without* a reasonable accommodation." Plaintiff's Opposition, p. 7 (emphasis added). Plaintiff admits that he "complained of pain associated with his disability and duties, and stated that he could not perform the job," but notes that he continued to work as a merchandiser "without any reasonable accommodations or negative impact on his performance" until he was terminated. *Id.* This argument, however, completely undercuts Plaintiff's first cause of action, which is predicated on the assertion that Plaintiff was denied the reasonable accommodation that he needed to perform his job.

## IV. The Retaliation Claim

Like ADA discrimination claims, ADA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001). Under this analysis, a plaintiff "must first present sufficient evidence to make out a prima facie case, that is, evidence sufficient to permit a rational trier of fact to find [1] that she engaged in protected participation or opposition under [the ADA], [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that

a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *Lovejoy-Wilson*, 263 F.3d at 223 (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)) (first set of brackets added in *Lovejoy-Wilson*; brackets around numbers in *Cifra*). "If the plaintiff meets this burden and the defendant then points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra*, 252 F.3d at 216.

In moving for summary judgment with respect to Plaintiff's second cause of action, Defendants argue that the "sole cause" of Plaintiff's termination "was his refusal to work any weekend," and that this cause had "no linkage to his claimed disability." Defendants' Memo, p. 22. This argument does not appear to contest Plaintiff's ability to make out a prima facie case, but rather to argue that Plaintiff cannot prove that Defendant's explanation for the firing—that Plaintiff was dictating his schedule by refusing to work weekends—was a pretext for retaliation. Nonetheless, Plaintiff's Opposition first addresses the question of whether Plaintiff has made out a prima facie case of retaliation, then attempts to satisfy step three of the *McDonnell Douglas* analysis by proving that "there exist material issues of fact with regard to Defendants' alleged legitimate business reasons" for firing Plaintiff. Plaintiff's Opposition, p. 11.

The Court agrees that Plaintiff has established a prima facie case of retaliation. First, it is undisputed that Plaintiff complained to management about alleged disability discrimination in his November 10 Letter, and there is no question that such a complaint constitutes protected activity. *See, e.g., Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)

(protected activities include "making complaints to management"). Second, there is no question that Phoenix was aware of the contents of the letter, which was hand-delivered to Srgo and discussed by Srgo and Plaintiff's Sales Manager, Curcio. Third, while Defendants characterize Plaintiff's termination as a "constructive resignation," Defendants' Memo, p. 23, it is undisputed that Srgo told Plaintiff that Phoenix would have to let him go because Plaintiff was dictating his schedule by refusing to work that weekend. (Defendants' 56.1 Statement ¶ 55; Plaintiff's 56.1 Response, p. 1; Castagnozzi: 175-76).

With respect to the fourth element, Plaintiff points out that he was never told that he might have to work on a weekend until shortly after Srgo discussed the content of the November 10 Letter with Curcio. Specifically, Plaintiff argues that after Srgo's conversation with Curcio:

> All of a sudden, Plaintiff was told that he might have to work the following weekend, and he complained directly to Curcio and Paterno about this punitive scheduling. After Curcio learned that Paterno had not in fact scheduled Plaintiff to work, he affirmatively ordered Paterno, for the first time, to schedule all of his merchandisers, including Plaintiff, to work the week following Thanksgiving. He made this order in direct response to Paterno asking him what they should do about Plaintiff's complaints about disability discrimination and without regard to Defendants' actual business needs. Finally, when Plaintiff confronted Defendants about this material breach of their promises, he was fired for "dictating schedules," even though Plaintiff was only trying to hold Defendants to their promises.

Plaintiff's Opposition, pp. 10-11.

Plaintiff's version of events is not entirely supported by the evidence. The parties agree that, at a sales meeting on November 18, 2011, Paterno told Plaintiff that he might be needed to work the Saturday after Thanksgiving. (Defendants' 56.1 Statement ¶ 49; Plaintiff's 56.1 Response, p. 1). There is no evidence that Paterno actually knew of Plaintiff's alleged disability

29

at the time of the sales meeting. Curcio testified that he did not tell Paterno about Plaintiff's November 10 Letter, (Curcio: 59), and both Curcio and Paterno testified that Srgo did not convey Plaintiff's complaints to Paterno. (Curcio: 60; Paterno: 44). Paterno himself testified that he not had heard about Plaintiff having a disability until he received Plaintiff's email dated November 18, 2011—several hours after Paterno told Plaintiff that he might be needed to work on the weekend after Thanksgiving. (Paterno: 44-45).

There is evidence, however, that on November 18, 2011, or November 21, 2011—a few days after his conversation with Srgo about the November 10 Letter—Curcio ordered Paterno to schedule all of his merchandisers to work the weekend after Thanksgiving. There is also evidence that Curcio insisted that all merchandisers work, even after Paterno noted that there was a chance he would not need Plaintiff. (Paterno: 56). Although Curcio did not mention Plaintiff's November 10 Letter or allude to Plaintiff's complaint at the time he insisted that Plaintiff work weekends, "[t]he causal connection needed for proof of a retaliation claim 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'" *Cifra*, 252 F.3d at 217 (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). Accordingly, the fact that Curcio insisted that Plaintiff work weekends less than two weeks after learning about Plaintiff's complaint of disability discrimination is sufficient to satisfy the "causal connection" element of a prima facie case of ADA retaliation.

Since Plaintiff has established a prima facie case, the burden shifts to Defendants to present evidence of a legitimate, nonretaliatory reason for the decision to terminate Plaintiff. *See Cifra*, 252 F.3d at 216. Defendants have met that burden by adducing evidence that Plaintiff was terminated over a dispute regarding whether Plaintiff would work on the weekend after

Thanksgiving, which Plaintiff himself acknowledged was a "[k]ey weekend for sales.." (Castagnozzi: 168). The parties agree that the reason given by Srgo for terminating Plaintiff was that "plaintiff was dictating his schedule by refusing to work that weekend." (Defendants' 56.1 Statement ¶ 55; Plaintiff's 56.1 Response, p. 1; Castagnozzi: 175-76).

Since Defendants have provided evidence that Plaintiff was fired because he was dictating his schedule, "plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra*, 252 F.3d at 216. Plaintiff has not provided any such evidence. Rather, Plaintiff argues that summary judgment should not be granted because there are factual disputes as to (1) whether the terms of Plaintiff's employment prohibited weekend work and (2) whether Defendants's stated reasons are mere pretexts for discrimination and retaliation.

With respect the first of these arguments, the Court sees no need to resolve the dispute regarding the terms of Plaintiff's employment. Plaintiff acknowledges that "Curcio and Paterno claim that although they promised Plaintiff that he would not ordinarily have to work weekends, they did inform him that Defendants' business needs may require him to work some weekends around the holiday and that Plaintiff agreed" to do so. Plaintiff's Opposition, p. 11. Plaintiff does not argue, or offer any evidence to prove, that Curcio and Paterno did not genuinely believe their claims to be accurate. To the contrary, Plaintiff's Opposition concedes that "the parties disagree as to the precise terms of Plaintiff's employment." *Id.*

Even if Curcio's and Paterno's recollections of their conversations with Plaintiff regarding weekend work could be proven to be incorrect, that would not establish that the two men were not genuine in their mistaken belief. If they believed that Plaintiff had agreed to work

weekends if necessary, they would still believe that Plaintiff was dictating his schedule by refusing to work weekends. Accordingly, the fact that Curcio and Paterno might be mistaken would not undercut their stated explanation for Plaintiff's firing.

Plaintiff's second argument suggests a misapprehension regarding the showing that is required in the third step of the *McDonnell Douglas* analysis. Plaintiff does not provide any evidence that Defendants' explanation for the firing was pretextual, but rather points to evidence that Curcio usurped Paterno's authority and made the decision to have Plaintiff work without regard to whether he was actually needed that weekend. This evidence establishes only that Curcio was adamant that Plaintiff work the weekend after Thanksgiving, not that Curcio was motivated by any retaliatory animus. Indeed, Curcio's email to Srgo entitled, "Castagnozzi – Potential Refusal to Work Sunday," reflects Curcio's belief that Plaintiff had told him he understood the need to work "certain holiday weekends," and was now reneging on that agreement. Leftin Declaration, Ex. 7. Accordingly, while Curcio's actions may have resulted from anger over Plaintiff's perceived intransigence, there is no evidence that Curcio was retaliating for Plaintiff's complaint of disability discrimination.

## V. The State- and City-Law Claims

A district court "may decline to exercise supplemental jurisdiction over a claim ... [if] ... the district court has dismissed all claims over which it has original jurisdiction ..." 28 U.S.C. § 1367(c)(3). Although "[t]he exercise of supplemental jurisdiction is within the sound discretion of the district court," *Lundy v. Catholic Health Sys. of Long Isl. Inc.*, 711 F.3d 106, 117 (2d Cir. 2013), the Second Circuit has repeatedly stated that "if a plaintiff's federal claims are dismissed before trial, 'the state claims should be dismissed as well.'" *Brzak v. United Nations*, 597 F.3d

32

107, 113-14 (2d Cir. 2010) (quoting *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008)). This rule is consonant with the Supreme Court's observation that when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988).

For the reasons stated above, the Court grants summary judgment to Defendants with respect to the first two causes of action alleged in Plaintiff's complaint. The remaining four causes of action allege claims under the NYSHRL and the NYCHRL. Since all federal claims have been dismissed, the Court declines to exercise supplemental jurisdiction over the remaining four causes of action in Plaintiff's complaint. *See Brzak*, 597 F.3d at 113-14.

## CONCLUSION

For the reason set forth above, Defendants' motion in summary judgment is granted with respect to the first two causes of action listed in Plaintiff's complaint. The Court declines to exercise supplemental jurisdiction over the remaining four causes of action, all of which allege State- and City-law claims. The Clerk of Court is directed to enter judgment in accordance with this Memorandum and Order and to close this case.

**SO ORDERED.**

s/SLT

SANDRA L. TOWNES
United States District Judge

Dated: September 26, 2016
      Brooklyn, New York